UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT ASHLAND

CIVIL ACTION NO. 09-13-DLB-EBA

SUSAN SPENCER                                                      PLAINTIFF

vs.                        MEMORANDUM OPINION AND ORDER

CITY OF CATLETTSBURG, KY., ET AL.                         DEFENDANT

*   *   *   *   *   *   *   *   *

Plaintiff Susan Spencer ("Spencer") commenced this 42 U.S.C. § 1983 action against Defendants City of Catlettsburg, Kentucky ("the City") and Pauline Hunt ("Hunt"), individually and in her official capacity as Mayor of the City[1], alleging that she was terminated in violation of her First Amendment free speech rights and Fourteenth Amendment due process rights. Furthermore, Plaintiff alleges her termination was a violation of Kentucky's Whistleblower Act, K.R.S. § 61.102, and constituted a wrongful discharge under Kentucky law in violation of public policy.

This matter is currently before the Court on Defendants' Motion for Summary Judgment (Doc. #29). The motion has been fully briefed, (Docs. #36, 39), and the Court finding that oral argument is not needed, the matter is ripe for review. For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED**.

---

[1] A suit against an individual in her official capacity is the same as a suit against the governmental entity. *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) (citing *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 68 (1989)). Therefore, the claim against Hunt in her official capacity should be treated as a claim against the City of Catlettsburg.

# I.    FACTUAL AND PROCEDURAL BACKGROUND

## A.    Spencer's Employment as Assistant City Clerk/Treasurer

In May 2008, Plaintiff Susan Spencer was hired by Defendant, the City of Catlettsburg, Kentucky, as Assistant City Clerk/Treasurer.  The City operates under the Mayor-Council plan of government, and, therefore, the authority to hire and fire employees rests with the mayor.  *See* K.R.S. § 83A.130(9).  At that time, Mayor James Allen Lambert[2] was responsible for hiring Spencer, along with a committee made up of City Council members and citizens of Catlettsburg.  Prior to her employment with the City, Spencer had no experience working for any city, county or other governmental agency, and she did not have any specific understanding of the duties and responsibilities of a city clerk or treasurer under the Kentucky Revised Statutes.  At the time Spencer was hired, Defendant Hunt was the City Clerk/Treasurer, a position she had held for thirty-five years.[3]  Initially, Hunt was Spencer's immediate supervisor.  Besides Hunt and Spencer, the office staff included Hunt's daughter, Jeannie, who was not an official employee and did not receive compensation from the City.

The City provided certain training to Spencer, and hired a specialist to train Spencer on the use of QuickBooks so she could utilize the software program to pay invoices and

---

[2] Allen was appointed Mayor by the City Council in late 2007 or early 2008 after former Mayor Don Wellman resigned from the position.   Apparently, without authorization from City Council, Mayor Wellman gave himself a $12,000 bonus and Hunt a $3,000 bonus.  When the councilmen approached Wellman to question him, he resigned.

[3] The decision to hire Spencer appeared to be motivated by the need for a succession plan, as Hunt was eighty years old and contemplating retirement.  In addition, Hunt had two heart attacks in recent years and because she had no assistant, the City Clerk/Treasurer's office remained closed while she recovered.

perform other duties.[4]  The City also sent Spencer to a week of training conducted by the Kentucky Municipal Clerks Institute and to another week of training on the topic of municipal grants.  Hunt claimed that she also gave Spencer written instructions regarding City funds and funds transfers, but Spencer denied ever having received the written instructions.  Furthermore, despite Spencer's willingness to learn, Spencer testified that Hunt refused to offer any specific instructions or training in order for her to learn the aspects of the job.[5]

Unfortunately, friction developed between Spencer and Hunt.  Lambert testified that both Spencer and Hunt repeatedly came to him complaining about one another.  Spencer believed that she and Hunt had two different perspectives about her job responsibilities and duties.  Spencer also believed that Hunt was jealous of Spencer's education.  She testified that Hunt did not like her because she "took up for" Mayor Lambert, who Spencer felt Hunt was trying to sabotage.  Ultimately, Spencer felt that Hunt did not want anyone, besides Jeannie, to help her perform her duties as City Clerk/Treasurer.

From Hunt's perspective, Spencer refused to perform certain tasks, would not listen to Hunt's instructions and insisted on doing things her own way.  Hunt disliked the way Spencer frequently spoke about her education and family connections.  Furthermore, Spencer frequently told Hunt that she had spoken with Mayor Lambert and that he was displeased with Hunt's performance as City Clerk/Treasurer.  According to Hunt, Spencer

---

[4] Prior to Spencer's employment, Hunt did not use a computer to perform her duties as City Clerk/Treasurer and typed all City invoices on a typewriter.

[5] According to Spencer, if Hunt did happen to answer one of Spencer's questions, Hunt provided false information.  For example, Spencer testified that Hunt told her to credit all of the gasoline bills to the police department.  However, the correct way to handle the gasoline bills was to break it down among all of the departments.

once told Hunt that she was going to ask Mayor Lambert to fire Hunt.

On July 4, 2008, in part because of her difficult working relationship with Spencer, Hunt announced that she would retire effective August 1, 2008. Thereafter, despite concerns that Spencer did not have the requisite background and experience, Spencer was promoted to the City Clerk/Treasurer, and Kay Cole was hired as the Assistant City Clerk/Treasurer. Meanwhile, Hunt had also filed the paperwork necessary to run as a mayoral candidate in the November 2008 election against Mayor Lambert.

Upon Spencer's appointment, she claims that she found "many incidents of financial irregularities" that were Hunt's responsibility as City Clerk/Treasurer.[6] For example, Spencer discovered that the City was paying for a phone line that was not in working order and had not been used for over ten years. The City was also overpaying the Bowling Feed & Hardware bills, resulting in a $700 credit to the City. She also discovered a situation in which one neighbor was paying a flood wall tax and the other was not. The City also had an outstanding bill with Clark Oil Company. Furthermore, according to Spencer, "the cell phone bills were all a mess because they were being sent to the police department... ." (Doc. # 42-2, at 30).

---

[6] In her Response to Defendants' Motion for Summary Judgment, Spencer alleged that one such incident involved Hunt using City funds to purchase pizza and cigarettes for prisoners. However, Plaintiff fails to provide a correct citation to the record for this assertion. Certainly, the Court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Nevertheless, even after an independent review of Plaintiff's deposition testimony, the record reveals that, in fact, *Spencer* as City Clerk/Treasurer used the City's General Fund to pay for prisoners' cigarettes and pizza at the direction of Mayor Lambert. (Doc. # 42, at 25-27). Furthermore, Plaintiff did not recall a separate incident in which Hunt as City Clerk/Treasurer used unauthorized City funds to pay for such expenditures. *See id.*

## B.     The "Missing" Records Investigation

The Kentucky Department of Libraries and Archives (KDLA) provides assistance to cities in managing official records and establishing proper document retention schedules. It does not ordinarily conduct records inventories and does not have the authority to enforce specific rules or procedures related to records management or document retention. Spencer learned about the KDLA's services during the training she received through the Kentucky Municipal Clerks Institute.   Upon her appointment as City Clerk/Treasurer, Spencer, with the approval of Mayor Lambert, contacted the KDLA for assistance.

On August 7, 2008, KDLA representative Tim McIntosh came to the City Clerk/Treasurer's office to meet with Spencer.  After Spencer's initial contact with KDLA and prior to McIntosh's visit, she learned that Hunt had supposedly removed a number of trash bags containing "obsolete" records or files from the office before her resignation and asked Michael Hedrick, the City's Building Inspector,  to deliver a box to former Mayor Wellman's house.[7]   Therefore, upon McIntosh's arrival, Spencer told him that she had reports of records being removed from the office.  According to Spencer, she showed McIntosh around the office, specifically showing him the vault and what the City had for bank financials.  Thereafter, McIntosh called his supervisor, Jerry Carlton, and stated that he had never been in a clerk's office with such few records and determined that the City must be missing records.

According to McIntosh, he discussed records management issues with Spencer and informed her that most financial records needed to be kept for three years, or longer if

---

[7] Despite Hunt's alleged removal of records, Spencer never made an effort to contact Hunt and inquire where any of the records could be found.

those records had not been audited. McIntosh testified that Spencer told him the City did not maintain financial records going back that far. Spencer showed McIntosh two boxes and stated that those documents were "all I have." (Doc. # 41, at 16). After McIntosh's inspection of the boxes, he noted that there were very few financial records prior to 2006. McIntosh also discussed with Spencer the City's need to retain permanent records, such as copies of audits, budgets, ordinances, resolutions and other records that document the history of the City itself. Spencer showed McIntosh the vault, where he did find some of the ordinances and resolutions. However, according to McIntosh, Spencer seemed to only be concerned with the financial records. McIntosh did not conduct an inventory of all the City's records at this time and relied on Spencer's representations regarding what records she had found in the office. Furthermore, at this meeting, Spencer gave McIntosh the background on Hunt and told him that she thought she would lose her job if Hunt was elected mayor.

After this initial meeting, McIntosh advised Carlton that the City might be missing some financial records. Carlton wrote a letter to Mayor Lambert and the City Council concerning McIntosh's observations and advised the City to consider an independent audit. Thereafter, Spencer prepared a list of records that she claimed were missing and sent the list to the City Attorney, Jeremy Clark.[8] Her list included several documents, including ones related to financial transactions, personnel files and bank statements. Clark then looked into the situation. He contacted the Commonwealth's Executive Director of Technology and

---

[8] Once KDLA confirmed that certain records were missing and City Attorney Clark started his investigation, Spencer testified that Mayor Lambert specifically told her not to contact Hunt regarding the missing records.

Audits, as well as the Attorney General. Both of those officials believed that an audit was not necessary given that all of the City's past audits had revealed a good report, the City was already scheduled to have an independent audit for the current year, the City had all the documents necessary to perform that audit and no financial wrongdoing was suspected. Clark advised Carlton of these opinions in a letter dated August 28, 2008.

On September 15, 2008, Spencer called McIntosh to set up a meeting with Clark. McIntosh scheduled a visit with Spencer and Clark on September 23, 2008. At this meeting, Clark asked McIntosh questions about the retention of records, retention schedules and whether the City could recreate records that were missing. McIntosh did not conduct an inventory or search of the City's records at this meeting. Following the meeting, Spencer wrote McIntosh a letter to "recap our findings of any missing records in our office." (Doc. # 29-9). She noted the City was still missing bank statements, bank deposit books, accounts receivable, accounts payable and some vendor invoices for 2005 and all audits other than those conducted in 1991, 2003, 2005 and 2006.

Meanwhile, a City Council meeting was scheduled for September 16, 2008. As was customary, Carrie Kirschner, a reporter for the Ashland *Daily Independent*, contacted Spencer for the agenda. During this phone call, Spencer "let it slip about the missing records" and gave Kirschner Carlton's phone number at KDLA.[9] (Doc. # 42-2, at 59). Mayor Lambert briefly addressed the missing records at the September 16 meeting, indicating that it had been discovered that the City was missing some records. Lambert

---

[9] According to Spencer, Kirschner would have been at the City Council meeting that night regardless of the alleged missing records issue. She always came unless she was sick, and then somebody else filled in for her.

reported that the City had investigated and contacted the KDLA and the State of Kentucky. Lambert also stated that the City had received a letter back stating that "everything was fine." (Doc. # 29-10).

However, beginning that night, the *Daily Independent* published a series of articles–dated September 16, 17, 26, October 25 and November 19–about the alleged missing records, for which Spencer was a source. While the record is unclear as to what exact comments Spencer made concerning the issue, the articles establish that Spencer disclosed several pieces of information: (1) she had contacted and requested assistance from KDLA on how to organize the City's files and learn proper retention schedules; (2) upon KDLA's arrival, they discovered several documents were missing; (3) what documents the City was supposedly missing; (4) when she served as Assistant City Clerk/Treasurer, Hunt did not allow her to handle City documents in the records storage vault; (5) when she took over, there were empty binders and file cabinets in the storage area; and (6) she could not confirm whether the records were there before Hunt left office as City Clerk/Treasurer. Spencer never directly stated that Hunt was responsible for the alleged missing records, but the series of articles certainly implied that Hunt was the culprit.[10]

During this time, Hunt was elected Mayor of the City of Catlettsburg and took office on November 3, 2008. The alleged missing records continued to be an issue and was addressed again at a "chaotic" City Council meeting on November 18, 2008. Several options were discussed at the meeting about how to conduct a proper investigation into the

---

[10] In fact, the *Daily Independent* articles report that Lambert was the one who disclosed that three city employees stated that they helped Hunt dispose of multiple trash bags, many of which appeared to be full of papers and/or files, the week she left office. Hedrick confirmed that he helped Hunt remove several trash bags from her office.

missing records.  Clark suggested that the City ask KDLA to conduct an inventory of the records in the City's possession, since KDLA had already been there twice and was familiar with the situation.  City Council approved Clark's suggestion.

On December 2, 2008, at the City's request, McIntosh and Carlton visited the City Clerk/Treasurer's office.  Hunt, Clark, Spencer and Cole were present on behalf of the City. Using a model records retention schedule, McIntosh and Carlton compared the records that should have been in the City's possession with the records that actually were in the City's possession.  Hunt was able to locate the specific documents that McIntosh and Carlton asked for, and many documents were found in places that McIntosh had not previously inspected when he visited in August.  Ultimately, McIntosh and Carlton determined that the City possessed all of the records it was required to keep, with the exception of bank statements for the six-month period of December 2005 to June 2006.  However, because the records were already audited with no problems and their permissible destruction date was quickly approaching, the City was advised that replacing these records was unnecessary.[11]  Thereafter, KDLA considered the matter closed.

### C.    Spencer's Performance as City Clerk/Treasurer

Hunt had numerous issues with Spencer's performance since she started in May 2008 as Assistant City Clerk/Treasurer.  Hunt recalled that Spencer made several errors when preparing the property tax bills.  Most significant was that Spencer incorrectly put the interest accrual date as October 2008 instead of January 2009.  Therefore, many citizens overpaid their tax bills and refunds had to be issued.  Furthermore, in July 2008, Spencer

---

[11] Even if the City needed to replace the documents, the records could have been easily reproduced by obtaining copies of statements and deposit slips from the City's bank.

incorrectly reported that the City's General Fund had an excess of $54,000. In actuality, an electronic funds transfer of $54,000 had been made to Kentucky Employers Mutual Insurance Company to pay a worker's compensation premium, but Spencer did not recognize that payment as a debit. Mayor Lambert also received several complaints regarding Spencer's performance from Hunt, Police Chief Plummer and the City's accounting firm.

The problems with Spencer's performance continued and became more apparent after Hunt was elected Mayor and took office in November 2008. For example, when expenditures are made, the Clerk must assign it as a debit against the appropriate account so City officials can keep track of their respective budgets. Spencer was not assigning expenditures to the proper municipal accounts. Spencer wrote a check out of the General Fund when it should have been written out of the Sewer Maintenance account. She also wrote checks from the Labor Day Fund for purposes unrelated to the City's Labor Day events and caused the account to be overdrawn by $3,900. Spencer failed to separate the payroll into the different departments. Furthermore, she deposited checks that the City received from Ashland Oil for a sewer project into the wrong account.

Because Spencer was not properly debiting and crediting specific accounts, she twice told City officials that they had sufficient funding for purchases when, in fact, they did not. Specifically, she told City Council that the City had enough money to fund a street paving project when the account was actually $30,000 short of the amount necessary to cover the cost of the project. Moreover, Spencer incorrectly told the Fire Chief that the Fire Department had $65,000 available for equipment in the 2008-2009 budget, resulting in the leasing of a fire truck that the Department could not afford.

Spencer also did not keep proper records relating to employee benefits. The City maintains a group insurance policy in which employees may choose to enroll at their own expense. Premiums are then deducted from participating employees' salaries and remitted to AFLAC, the insurance carrier. However, Spencer wrote a check out of the City's General Fund to cover the premiums and did not deduct the costs from employees' paychecks. Once the error was discovered, the City had to demand payment from the affected employees. Likewise, the City offered a Christmas Club to its employees. As Clerk/Treasurer, Spencer was responsible for depositing the money that had been deducted from employees' pay checks into a separate bank account to fund the employees' Christmas Club accounts. However, Spencer failed to do so.

In addition to Spencer's performance errors, Hunt discovered that other employees and outside contractors had difficulty working with Spencer. For example, the accountant from Kelley, Galloway & Company, who performed the City's annual audit, complained to City Attorney Clark that Spencer was interfering with his work. Kay Cole, the Assistant Clerk/Treasurer at the time, complained to Hunt that Spencer allowed her thirteen year-old daughter, Veronica, to come into the office almost every day. Veronica would sit at Cole's workspace, use Cole's computer and leave behind a mess of food and papers for Cole to clean up. Additionally, Veronica asked Cole to give her money from the petty cash drawer. Finally, Chief of Police Plummer threatened to quit because he was frustrated with Spencer, who repeatedly called him and asked how to perform her job duties.

### D. Spencer's Termination

Mayor Hunt called a special meeting of City Council on December 3, 2008 for dual purposes. First, Hunt had decided to terminate Spencer and wanted to hold an executive

session to discuss the personnel matter.  Second, City Attorney Clark wanted to discuss KDLA's findings regarding the alleged missing records after Carlton and McIntosh visited the Clerk's office on December 2, 2008.

During executive session, Hunt provided the City Council members with a written memorandum explaining why she believed Spencer should be terminated.  She also read a report addressing the same issues.  Hunt's main concerns involved Spencer's lack of experience necessary to handle the duties of a city clerk and treasurer and her continuous mistakes in the performance of her duties.  Specifically, Hunt noted that Spencer had:

1. Never secured a bond or taken an oath of office as required by statute;

2. Made serious mistakes in preparing the ad valorem tax bills;

3. Incorrectly reported the amount in the Budget Account, which was off by $51,000[12];

4. Repeatedly failed to debit various accounts correctly;

5. Failed to make deposits for employees' Christmas Club accounts;

6. Gave incorrect information to the Fire Department concerning the money available to purchase equipment;

7. Allowed City Council to believe that sufficient funds existed in the Street Paving Fund to perform a specific project, and then inappropriately transferred money form the General Fund to pay the contractor who performed the work on that project because there was insufficient funds in the Street Paving Fund;

_____

[12] In her deposition, Hunt testified this amount was $54,000.

8.      Allowed the Labor Day Fund to be overdrawn by $3,900 by writing checks out of that account that should not have been written;

9.      Credited checks that belonged to the Sewer Fund to other accounts and failed to transfer any money into two different sewer funds, in violation of state regulations and local ordinances; and

10.     Neglected to order salt in a timely fashion, causing the price to be much higher than what the City had budgeted.

(Docs. # 29-19, # 29-27).  No mention at all was made regarding Spencer's comments to the *Daily Independent* or the missing records allegations.  City Council did not vote on the matter but also did not disagree with Hunt's decision to terminate Spencer.  At this meeting, Hunt also recommended that the offices of City Clerk and Treasurer be separated and that the City freeze all expenditures until the City's financial status could be checked.  City Council approved both recommendations.

The day after the meeting, Hunt terminated Spencer.  The Notice of Termination indicated that Spencer was being terminated for her poor performance as City Clerk/Treasurer and noted several mistakes she made concerning the City's financial transactions.  Thereafter, Spencer filed this suit, alleging that her termination violated her First Amendment free speech rights and Fourteenth Amendment due process rights. Furthermore, she alleged a violation of the Kentucky Whistleblower Act and a common law wrongful discharge violation.  (Doc. # 1).

## II.    ANALYSIS

### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The "moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). The moving party may meet this burden by demonstrating the absence of evidence concerning an essential element of the nonmovant's claim on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, it must produce specific facts showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir.

2001).

**B.  Plaintiff's § 1983 Claims**

Section 1983 specifically authorizes "any citizen of the United States or other person within the jurisdiction thereof" to pursue "an action at law [or] suit in equity" against every person who under color of state law "causes...the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]"  42 U.S.C. § 1983; *Neuens v. City of Columbus*, 303 F.3d 667, 670 (6th Cir. 2002).

**1.  First Amendment Retaliation**

Public employees have a constitutional right to speak on matters of public concern without fear of retaliation from their government employers.  *Connick v. Myers*, 461 U.S. 138, 140 (1983); *Pickering v. Bd. of Educ. of Township High Sch.*, 391 U.S. 563, 574 (1968).  However, the Supreme Court has recognized that the government's interests as an employer in regulating the speech of its employees "differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering*, 391 U.S. at 568.  In order to demonstrate a prima facie claim of First Amendment retaliation, a public employee must show that:

(1)     she engaged in constitutionally protected speech;

(2)     she was subjected to adverse action or was deprived of some benefit; and

(3)     the protected speech was a substantial or motivating factor in the adverse action.

*Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 897 (6th Cir. 2001) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).  If the plaintiff can establish a prima facie case, "the burden of persuasion shifts to the defendant who must

15

show by a preponderance of the evidence that there were other reasons for the adverse action and that the same adverse action would have resulted even if the plaintiff had not engaged in the protected activity at issue." *Leary v. Daeschner*, 349 F.3d 888, 898 (6th Cir. 2003). The parties do not dispute that Plaintiff was subject to an adverse action when she was terminated from her position as City Clerk/Treasurer. However, Defendants argue that Plaintiff's retaliation claim, against both the City and Hunt, must fail because she cannot establish that her comments to the *Daily Independent* were protected or that her speech was a substantial and motivating factor in the decision to terminate her. In the alternative, Defendants assert that Plaintiff would have been terminated for non-retaliatory reasons regardless of her speech.

## I.    Protected Speech

To determine whether an employee engaged in constitutionally protected speech, the court must apply a three-part test. *See Evans-Marshall v. Board of Educ. of Tipp City Exempted Village Sch. Dist.*, 624 F.3d 332, 337-38 (6th Cir. 2010). First, the court must determine whether the speech involved a matter of public concern. *Connick*, 461 U.S. at 143. If so, then the Court must apply the *Pickering* balancing test and weigh "the interests of the public employee, 'as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003) (quoting *Pickering*, 391 U.S. at 568). Finally, the Court must determine whether the speech was made pursuant to the employee's official duties. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Even if the speech relates to a matter of public concern, "when public employees make statements pursuant to their official duties, the employees are not

speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.*

Whether speech involves a matter of public concern is a question of law. *Leary*, 349 F.3d at 898 (citing *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003)). The Court must consider the content, form and context of the statement based on the record as a whole. *Connick*, 461 U.S. at 147-48. A public concern relates to "any matter of political, social, or other concern to the community." *Id.* at 146. In other words, the court must determine whether the speech involves "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Brandenburg*, 253 F.3d at 898 (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)). For example, speech "informing the public that a governmental entity failed to discharge its governmental responsibilities or bringing to light actual or potential wrongdoing or breach of public trust on the part of a governmental entity or any officials therein" is clearly a matter of public concern. *Rodgers*, 344 F.3d at 596 (quoting *Connick*, 461 U.S. at 148) (internal quotations and parentheticals omitted). On the other hand, when the employee speaks not as a citizen but rather as an employee upon matters of personal interest, her speech is not afforded First Amendment protection. *Taylor v. Keith*, 338 F.3d 639, 644 (6th Cir. 2003) (citing *Connick*, 461 U.S. at 147); *see e.g., Farhat v. Jopke*, 370 F.3d 580 (6th Cir. 2004) (employee speech was not a matter of public concern since the focus of employee's letters was a personal gripe with employer); *Rahn v. Drake Ctr, Inc.,* 31 F.3d 407 (6th Cir. 1994) (press release issued by nurse did not touch upon public concern because the focus was not on patient

endangerment so much as it was employee dissatisfaction with work rules).

The main inquiry, when distinguishing between matters of public and private concern, should focus on what the speaker intended to communicate through the speech and not her motivation for doing so. *Taylor*, 338 F.3d at 645. The Court is certainly mindful of the fact that Plaintiff stood to gain from her speech. According to Plaintiff, Hunt stated that she would fire Spencer if she was elected Mayor. However, even if the Court were to assume that Plaintiff's predominant motivation for speaking was securing a job for herself, the point of Plaintiff's speech could still directly address matters of public concern. *See Chappel v. Montgomery Cnty. Fire Protection Dist. No. 1*, 131 F.3d 564, 575-78 (6th Cir. 1997) ("The fundamental distinction ... is the distinction between *matters* of public concern and *matters* only of personal interest, not civic-minded motives and self-serving motives.").

In the present case, Plaintiff's speech concerned alleged missing records that the City was required by law to maintain and implicated that Hunt, as past City Clerk/Treasurer, may have been responsible for improperly removing these records from the City's possession. The purpose of the speech was clearly to bring to light potential misconduct that warranted further investigation. Retention of records by a municipality and destruction of public documents are issues governed by Kentucky state law. Defendants' purported failure to follow state law was certainly a concern to the community. *See id.* at 576 (public interest "is near its zenith when ensuring that public organizations are being operated in accordance with the law."). Moreover, given that Hunt was running for Mayor at the time, the citizens of Catlettsburg were certainly interested in whether she had engaged in misconduct as the City Clerk/Treasurer. In fact, the public had a strong reaction to the newspaper articles, resulting in a chaotic City Council meeting and subsequent

investigation. *See id.* at 578. Consequently, the Court finds that Spencer's speech involved a matter of public concern.

Defendants argue that Plaintiff's speech is not protected because it was blatantly false or made with reckless disregard as to its truth or falsity. False statements deliberately or recklessly made are not entitled to First Amendment protection. *See v. City of Elyria*, 502 F.3d 484, 492 (6th Cir. 2007) (citing *Pickering*, 391 U.S. at 574) ("Although First Amendment protection might not be available if the employer can show that the public employee knowingly or recklessly made false statements, a public employee is not required to prove the truth of his or her speech in order to secure the protections of the First Amendment."). Despite Defendants' assertion that the alleged missing documents were subsequently found in the Clerk's office with relative ease, the record shows that six months of financial statements, that the City was required to maintain, were missing. Therefore, Spencer's statements were not blatantly false, and Defendants' argument in this regard is without merit. Furthermore, the fact that Hunt was able to locate many of the alleged missing documents does not indicate that Spencer made the statements with reckless disregard as to their truth or falsity. Spencer testified that Hunt did not have an organized filing system nor did she allow Spencer to handle these documents when Spencer was Assistant City Clerk/Treasurer. It is not unlikely that, despite a thorough search, Spencer was not able to locate many of the City's records.

Because Plaintiff's speech involved a matter of public concern, the Court must now balance Plaintiff's interest, as a citizen, in making her speech against Defendant's interest in promoting the efficiency of public services. *See Pickering*, 391 U.S. at 568. When

evaluating these two interests, courts should consider whether the employee's comments "meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir. 1994). Defendants argue that Plaintiff fails the *Pickering* balancing test because her comments created a substantial controversy among the residents of Catlettsburg and City officials, led to a chaotic City Council meeting, discredited Hunt in her bid for Mayor, and required substantial time and effort on the part of the City Attorney and other state officials to resolve. Defendants' argument is unpersuasive.

Defendants have not provided any evidence that Plaintiff's comments interfered with her ability to perform her job as City Clerk/Treasurer. If anything, the records supports the opposite conclusion. After Spencer's comments, an inventory of the City Clerk's office was performed and many of the records Spencer was unable to locate were found. Furthermore, the City discovered what records were missing and whether it was required to obtain copies of these records. Despite Defendants' assertion, the speech did not create disharmony among the City employees. While it may have riled up some of the citizens of Catlettsburg, the evidence shows that the City employees were invested in resolving the issue. Mayor Lambert, City Council, City Attorney Clark, Spencer, and Cole were all dedicated to finding the supposed missing records and ensuring that the City was compliant with state law. Undoubtedly, the investigation took time and effort to complete, but the allegations were legitimate concerns that needed to be addressed. In the event of an open

records request, the City would be required to find these records. Therefore, Plaintiff's interest as a citizen in commenting upon a matter of public concern outweighed the City's interest in promoting the efficiency of public services.

Finally, the Court must determine whether Plaintiff's speech was made pursuant to her official duties as City Clerk/Treasurer. *See Garcetti*, 547 U.S. at 421. The Supreme Court has "had no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate," but it has explained that "the inquiry is a practical one" and the courts should focus on "the duties an employee actually is expected to perform." *Id.* at 424-25. Defendants argue that Plaintiff's duties as a municipal clerk include preparing agendas for city council meetings, advertising public meetings in the local newspaper, distributing agendas to those who requested them, and responding to open records requests, and, therefore, Spencer's communications with the *Daily Independent* reporter were made pursuant to her official duties as City Clerk/Treasurer. The Court disagrees.

Defendant has not offered any evidence that as City Clerk/Treasurer, Plaintiff was responsible for speaking to the press regarding issues discussed at City Council meetings, besides merely providing an agenda of the issues. Defendants actually unintentionally rebut their own argument in their motion for summary judgment when they claim that "[t]he City had the right to ensure that Spencer's response to Kirschner's request for an agenda was contained to merely providing an agenda." (Doc. #29, at 19). If Defendants claim that Plaintiff had no right to comment on the alleged missing records, then certainly it was not one of her official duties to discuss this with the press. Thus, the Court finds that Plaintiff's speech was not made pursuant to her official duties as City Clerk/Treasurer. Accordingly,

the Court concludes that Plaintiff engaged in constitutionally protected speech as a matter of law.

### ii.    Substantial and Motivating Factor

In order to establish a First Amendment retaliation claim, the plaintiff must further demonstrate "that the speech at issue represented a substantial or motivating factor in the adverse employment action" and "point to specific, nonconclusory allegations reasonably linking her speech to employer discipline." *Rodgers*, 344 F.3d at 602 (internal citations and quotations omitted).  A substantial and motivating factor is essentially a but-for cause, "one without which the action being challenged simply would not have been taken." *Holzemer v. City of Memphis*, 621 F.3d 512, 525 (6th Cir. 2010) (quoting *Greene v. Barber*, 310 F.3d 889, 897 (6th Cir. 2002)).  While causation is usually a question to be resolved by a jury, "a court may grant summary judgment on the issue of causation when there is no genuine issue of material fact from which a reasonable jury could conclude that the employee's discharge was motivated in part by her speech." *Burgess v. Paducah Area Transit Auth.*, 387 F. App'x 538, 545 (6th Cir. 2010) (citing *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997)).

Plaintiff argues that temporal proximity raises an inference of retaliatory intent. However, the Sixth Circuit has recently summarized case law on the weight given to temporal proximity in First Amendment retaliation cases "as recognizing the possibility that, on a particular set of facts, *extremely close* temporal proximity could permit an inference of retaliatory motive, but also recognizing that often evidence in addition to temporal proximity is required to permit the inference." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010) (emphasis added).  Indeed, courts have rarely found a

retaliatory motive based solely on temporal proximity. *Id.*

Plaintiff correctly states that she was terminated on December 4, 2008, less than one month after Defendant Hunt took office as Mayor. However, Plaintiff's calculation of temporal proximity is incorrect. Temporal proximity refers to the time that elapses between the protected activity, Plaintiff's comments to the *Daily Independent*, and the adverse action, Plaintiff's termination. Plaintiff first commented on the alleged missing records on September 16, 2008. Therefore, the temporal proximity between her protected activity and her termination was approximately two and one-half months. Given the set of facts before the Court, Plaintiff has not proven a retaliatory motive based on temporal proximity alone.

The only other evidence that Plaintiff relies upon to prove a retaliatory motive is that Hunt was also responsible for "many incidents of financial irregularities" when she was City Clerk/Treasurer. (Doc. #36, at 11). The Court interprets Plaintiff's argument as one for disparate treatment. *See Vereecke*, 609 F.3d at 400 (finding that circumstantial evidence such as the "disparate treatment of similarly situated individuals" is appropriate to consider when determining whether the protected speech was a substantial and motivating factor in the termination). Despite the fact that Hunt's supposed financial irregularities pale in comparison to the mistakes Spencer made while in office, Hunt and Spencer are not similarly situated for the purposes of a disparate treatment argument. Hunt and Spencer had different authorities responsible for firing them from their positions as City Clerk/Treasurer. Therefore, any argument regarding disparate treatment is misplaced.

Furthermore, Plaintiff herself testified that Hunt told her, *while Hunt was still City Clerk*, that the only reason Hunt was running for mayor was to beat Lambert and fire Spencer. (Doc. #42-2, at 242). Therefore, according to Spencer, Hunt decided to

terminate Spencer sometime between May and July 2008, before Spencer made any comments regarding the alleged missing records. McIntosh also testified that on his first visit to the City Clerk/Treasurer's office, Spencer told him that she thought she would lose her job if Hunt was elected mayor. Again, this visit took place on August 7, 2008, well before Spencer made any comments to the press concerning the alleged missing records. Consequently, Spencer cannot establish that her comments to the *Daily Independent* were the but-for cause of her termination.

However, even if the Court were to conclude that Plaintiff has presented a prima facie case of First Amendment retaliation, the Defendants still have the opportunity to present evidence that Plaintiff would have been terminated even in the absence of her protected speech. *See Banks*, 330 F.3d at 893. Defendants assert that, regardless of Spencer's comments to the *Daily Independent*, she would have been terminated for poor performance. Spencer's work performance was a problem from the beginning. Hunt testified that when Spencer was the Assistant City Clerk/Treasurer, she incorrectly prepared the City's property tax bills and misrepresented to Council that the City had an excess of over $50,000 in the budget. When Spencer became City Clerk/Treasurer, Mayor Lambert received several complaints about Spencer's performance from the Chief of Police and the City's accounting firm. Moreover, Lambert testified that he and City Council had serious doubts about whether Spencer had the requisite background to perform the duties of City Clerk/Treasurer. Furthermore, when Hunt was elected Mayor, she found that Spencer had made several other major accounting errors and clerical mistakes. Hunt also received complaints from Cole about Spencer bringing her daughter into the office, and Police Chief Plummer threatened to quit if he had to continue to work with Spencer. This

24

evidence certainly provided justifiable grounds for Spencer's termination. Plaintiff makes no effort to refute Hunt's nonretaliatory reason for Spencer's termination and offers no evidence to demonstrate that her protected speech was indeed a motivating factor in Hunt's decision. Therefore, Defendant Hunt has shown by a preponderance of the evidence that there were other reasons for Plaintiff's termination and that Plaintiff would have been terminated even if she had not made comments concerning the alleged missing records to the *Daily Independent*. *See Leary*, 349 F.3d at 898. Because no genuine dispute of material fact exists to whether Defendant Hunt violated Plaintiff's First Amendment rights, she is entitled to summary judgment on that claim.

One final matter deserves comment. The liability of local government entities cannot be premised on a theory of *respondeat superior*. *Doe v. Claiborne Cnty.*, 103 F.3d 495, 505-06 (6th Cir. 1996). Therefore, a governmental entity can only be held liable on the basis of its own conduct. *Id.* at 507. To prevail on a § 1983 claim against a municipality, a plaintiff must establish: (1) that she suffered a deprivation of a constitutionally protected interest; and (2) the alleged deprivation was caused by an official policy, custom, or usage of the municipality. *Monell v. New York Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Because Hunt did not violate Plaintiff's First Amendment rights when she terminated Spencer, Plaintiff cannot rely on Hunt's conduct to also establish a claim of municipal liability against the City of Catlettsburg. *Vereecke*, 609 F.3d at 404 (citing *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986)). Therefore, Plaintiff's First Amendment claim against the City of Catlettsburg must also fail.

## 2.    Due Process Violation

Plaintiff contends that Defendants violated her due process rights when they terminated her without a pre-termination hearing, a right to present a defense and an impartial decision maker.  To establish a claim for deprivation of a property interest without due process of law, Plaintiff must show that she had a property interest in continued employment with the City of Catlettsburg.  *See Brown v. City of Niota*, 214 F.3d 718, 720 (6th Cir. 2000).  The inquiry into "what process is due" is relevant only if Plaintiff can first establish a constitutionally protected interest.  *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005);  *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 141 (6th Cir. 1997) ("Absent a property interest in her position ...[Plaintiff] was not entitled to any pre-deprivation process whatsoever.").

Entitlement to a property interest is determined by reference to state law.  *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Ludwig v. Bd. of Trustees*, 123 F.3d 404, 409 (6th Cir. 1997).  A property interest is created by statute or regulation, a formal contract, or a contract implied from the surrounding circumstances.  *Ludwig*, 123 F.3d at 409.  Thus, Spencer must point to some statute, regulation, ordinance or other legal provisions, such as a civil service act, to support her contention that her employment with the City was a protected property interest.  *See McManamon v. Charter Twnsp. of Redford*, 238 F.3d 422, at *4 (6th Cir. 2000) (unpublished).  If no such law exists, a property interest may be conferred via contract.  Under Kentucky law, unless the parties specifically manifest an intention to condition termination pursuant to express terms, employment is considered at will.  *Bailey*, 106 F.3d at 141.  An at-will employee is subject to termination at any time without cause.  *Id.*  As such, an at-will employee cannot properly claim a protectable

property interest in her job.  *Id.*

Spencer has not identified any statute, regulation, ordinance or other legal provision to show that she had a property interest in her continued employment with the City of Catlettsburg.  Nor has she identified any contract or mutual understanding as evidence of an intention to condition her termination pursuant to express terms.  In fact, in her response, she merely states that Defendants concede that Plaintiff has a property interest in her continued employment.  This is incorrect.  Defendants argue that Plaintiff has not sustained her burden of establishing that she had a protected property interest in her continued employment.

K.R.S. § 83A.080(3) permits the mayor in cities with a mayor-council form of government to appoint and remove non-elected city employees at will, "unless otherwise provided by statute or ordinance."  Defendants produced a longstanding City of Catlettsburg Ordinance that states "an employee cannot be fired or dismissed unless approved by a majority of the Board of Council," but only after the employee has one year of tenure or service.  (Doc. #29-31).  Therefore, Plaintiff could not reasonably believe that she had a protected property interest in her continued employment with the City, because she was only employed for approximately six months.  Accordingly, Plaintiff does not allege any cognizable property interest in her job as City Clerk/Treasurer, and, therefore, fails to state a due process claim against both Hunt and the City of Catlettsburg.

One brief matter deserves additional comment.  Because Plaintiff has failed to establish that her termination violated her First Amendment right to free speech or her Fourteenth Amendment due process rights, the Court need not go into detail when addressing Defendant Hunt's qualified immunity argument.  Simply put, having failed to

establish a constitutional violation, Hunt is entitled to qualified immunity.

### C.    State Law Claims

In addition to alleging federal constitutional injuries, Plaintiff asserts two additional claims arising under Kentucky state law.  However, it is unnecessary for the Court to address the merits of summary judgment with respect to the state law claims.  "Under 28 U.S.C. § 1367(c)(3), the district court may decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction.  If the federal claims are dismissed before trial, the state claims generally should be dismissed as well." *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) (quoting *Wojnicz v. Davis*, 80 F. App'x 382, 384-85 (6th Cir. 2003)) (internal quotations omitted); *see, e.g., Harper v. AutoAlliance Int'l, Inc.,* 392 F.3d 195, 210 (6th Cir. 2004); *Musson Theatrical v. Fed. Express Corp.,* 89 F.3d 1244, 1254-55 (6th Cir. 1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed.").

Because the Court's jurisdiction over Plaintiff's state law claims was supplemental under 28 U.S.C. § 1367(c), and Plaintiff's federal claims have now been dismissed, the Court declines to continue exercising supplemental jurisdiction over the state law claims in this matter.  *See* 28 U.S.C. § 1367(c)(3).

### III.    CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** that:

(1)    Defendants', City of Catlettsburg, Kentucky and Pauline Hunt, Motion for Summary Judgment (Doc. # 29) is hereby **GRANTED**;

(2)     Plaintiff's federal claims are hereby **DISMISSED WITH PREJUDICE**;

(3)     The Court declines to exercise supplemental jurisdiction; therefore, Plaintiff's

        state law claims are hereby **DISMISSED WITHOUT PREJUDICE**; and

(4)     This case is hereby **STRICKEN** from the active docket of this Court.

This 14th day of April, 2011.

Signed By:

*David L. Bunning*   DB

**United States District Judge**